USA v. Bryan Watson 17-1221 USA v. David Hansberry Argument not to exceed 20 minutes per side. Mr. Fishman and Mr. Reagan, you may proceed for the appellate. Good morning, Your Honors. My name is Philip Reagan and I represent David Hansberry. I want to just jump right into it. This is a very interesting case. This case was in the Eastern District. Mr. Hansberry was charged with ten counts in the indictment. Convicted on only one count. Acquitted on nine of the ten counts. Now, the one count that he was convicted on was conspiracy to extort based on the official color of right. Now, what our issue is, is that Mr. Hansberry was not convicted upon the charge in which he was indicted for. Well, we can have inconsistent verdicts. Well, Judge, I know. I don't think this is really an inconsistent verdict. I don't think this is inconsistent. I think the heart of the indictment tells you that he's being indicted for extortion. Now, the statute reads robbery or extortion. And what I think is interesting is that even when the court, the district court gave instruction to the jury, they included an instruction of robbery. Now, it's our position, based on the evidence that was argued in the case by the government, that it expanded this indictment to include robbery. On the face of the indictment, it simply states conspiracy to extort. What effected the expansion, the instruction? Well, I think the evidence. The evidence, all the evidence in the case was robbery, robbery, robbery. The government itself called a witness in particular, a gentleman by the name of Louis Mars. I mean, I know that they were using the term rip. Well, they were. I guess the government's argument is that this conduct that came in at evidence, you know, maybe it counts as robbery, but in their view it counts as extortion as well. That's why it was kind of both charged, but then they decide, they make a choice to try, you know, to go only for extortion. If it is extortion, potentially, you know, then it's not an amendment of the indictment, I guess. Well, and I think that's important, Your Honor. I think that even the government in cross-examining their witnesses or in calling the witnesses, asked the witnesses what was happening. The witnesses said, hey, we were going in houses, we were robbing people, we were taking things. And even the government itself says, oh, okay, you were robbing folks. So the government in its mind. They use that word some of the time, but a lot of the time wasn't the description of what was happening with these stops was that they made agreements, right? We're going to take 10% off the top and we're going to let you go. And the drug dealer says, hey, we're cool. Well, I think it's also important. I mean, they didn't say we're being robbed in that particular occasion. Absolutely. But I think what's important, these officers were acting in their official capacity as police officers. And they were, they had the ability to legally take and seize drugs and money. And this is what they were doing. And what they were doing, they were seizing this money and then they were making deals, as good police officers do, to flip criminals to get more information. I don't think. But as police officers, they could also give an assurance that the person wasn't going to get prosecuted, right? Well, I think. And that person could believe it because they were police officers, that they would be taken care of, that they wouldn't get into trouble. But I don't think that is an agreement. I think that's what police officers do in the line of duty as good police officers. I don't think that's extortion. I think you have to have an agreement to take something personally or make an agreement between the criminal and the officer and say, hey, I'm going to accept this dope and I'm going to accept this money personally. I'm going to take it. I'm going to keep it. That was never the situation. They were acting on behalf of the city of Detroit. They were in their duties as police officers tricking. Weren't there some of the times where they took some of the drugs and left the rest of the drugs with the person they were stopping? Well, those were allegations by the government. But again. Well, they were allegations that were put before the jury. Absolutely. And I think what's really interesting here is the jury acquitted Mr. Hansberry on all the conspiracy to extort counts. They were acquitted. And except for count one, which included a robbery instruction. And that is our issue. And the lower court had an opportunity to look at this. They were acquitted on all the conspiracy to extort. I thought it was the substantive. I'm sorry, the substantive. I apologize. I apologize. The substantive counts, three through eight, they were acquitted on. It was the one count one conspiracy to extort. Count one, the conspiracy count, you said they were instructed in a way that it would encompass robbery? Exactly. They were instructed. Did anyone object to that instruction? You know, Your Honor, at the time, it was not objected to. But it was brought back at the district court in the order, in the motion for order for a new trial. It was brought back. And Judge Murphy addressed it at that time. He addressed it and said, well, hey, there are two separate. The conspiracy is separate from the substantive offense. There's two separate things. There was plenty of evidence here that the jury could have found extortion on. They could have found extortion on. You said they were instructed on robbery. Is that, as I understood it, the argument was that Judge Murphy, at some points, was loose with his language in using robbery. But at later points and at the most formal points, the instruction was our pure pattern instruction. Was that fair? It was. That's very fair. And I apologize, Judge, for any misinterpretation. I apologize. But as the court stated, Judge Murphy. Am I remembering correctly? The jury did specifically ask whether they had to find somebody guilty of one of the substantive counts in order to find them guilty on count one. Is that right? That is absolutely correct, Your Honor. That is absolutely correct. So in their own minds, they were thinking we might go a different way? Yeah. You're saying it's because that word robbery was included in count one. Absolutely. It was never included. The problem was I think everybody missed it. It was initially in the indictment when the government superseded. They took robbery out. Out of count one. Out of count one completely. It's not in count one. It's not in count one. They read the indictment. They're not going to see robbery. Not going to see robbery. So therefore, in preparing for the case of the defendant, you're thinking extortion, extortion. Then the government presents this case, this big robbery case. What is unique to robbery here? It's kind of a weird fit for either, frankly, this whole fact pattern. What's so unique to robbery that now when the jury hears this evidence, they're thinking robbery, not extortion? Well, I think it's important because there was a case, Gary Jackson. It was an individual. I'm sorry. Gary Jackson who said that Mr. Hansberry took over a million dollars. They took over a million dollars. By extortion, too. Yeah. I think that the extortion situation, and again, I want to just be clear on the extortion situation. In order to extort, there still needs to be a quid pro quo. There needs to be some type of an agreement. Well, let me stop you there because that may be controversial. I thought the distinction was in robbery, you take something away from somebody and he's got nothing to do with it. You took it. In extortion, he gives it up willingly, albeit reluctantly, under duress because, you know, you're going to shoot my dog if I don't give you my ring. And that's the distinction. Absolutely. Okay. And at least arguably, there was some evidence in both directions. I guess you didn't argue, we didn't extort this guy, we robbed him, and therefore you should acquit us. That wasn't an argument you made, was it? Can I ask, just to clarify one thing, was there a quid pro quo requirement here because they were public officials or police officers? I would think it would have to be. But was the jury instructed that they had to find a quid pro quo in the substantive counts? No. No, Your Honor. I think that here, and I think that it's clear. I'm sorry, can I finish, Your Honor? I see I'm out of time. Yeah, go ahead. I think it's clear that the jury acquitted on the substantive counts, the specific counts of extortion. The one count that they found Mr. Hansberry guilty on included robbery and extortion. And I think that was confusing, and I think that that- When you say included, I mean, was it some intermediate point where Judge Murphy said something? Yeah, Judge Murphy talked about robbery. He talked about robbery. He even said, well, yeah, and even the government says, yeah, Judge Murphy talked about robbery. But then I understand the actual statute itself says robbery. Even though the indictment does not state anything about robbery. The alternative, it says robbery. Is that what you're saying? That's correct. That's correct. All right, you'll have your rebuttal. We'll hear from Mr. Fishman. Good morning to the Court. Steve Fishman. I represented Mr. Watson at the trial, and I represent him here. My intention was, with only 10 minutes, I wanted to stand on my brief and kind of what Mr. Reagan was arguing to you, and I wanted to discuss the sentencing issue because, to me, that's one of the more interesting issues I've ever had in 45 years and hundreds of jury trials, and it's interesting for the reason that was originally begun by Mr. Reagan, which is I've never had a case before where there's 10 counts, including very, very serious substantive charges, including dope deals, including conspiracy to sell drugs against police officers, and they're acquitted on 9 out of 10. Actually, Mr. Watson was only 8 out of 9 because one of the counts supposedly only involved Hansberry. The reason it makes such a difference here is that the second thing I've never seen before, I've never had a case ever where the loss amount or the stolen amount that's alleged by the great Gary Jackson had such an effect on the guidelines. And in this case. 900 that Judge Murphy used? It was over 900,000, yes. It was in the vicinity of 920, 940. The reason that nobody knows is because the only person who ever said anything about it was Gary Jackson, okay? And Gary Jackson said a lot of things that weren't accurate that I was able to expose on cross-examination, which I'm sure contributed to the not guilty verdicts on a lot of these other counts. But let me tell you why it made such a difference. It made a difference to me doing what I did, which you read in the transcript, which I've also never done in all these years. I'm sitting there, it's Hansberry's sentencing, and they get to the part about the loss amount. And I'm in the peanut gallery in the back, and I stick my hand up. Luckily I know Judge Murphy a long time. Judge says, okay, I don't mean to interrupt, but I'd like to be heard because I know how significant this issue is. And why did I do it? I did it partly because I wanted to be heard because I knew how significant, but partly because I was worried that the judge would do exactly what he wound up doing. And what did he wind up doing? He made a finding with respect to Mr. Hansberry, and he made some factual findings, which, as the court knows, don't apply to me because the case law pretty much says that, right? And then- The finding that Mr. Hansberry was responsible for a $900,000 loss. Exactly. The loss being to the government because they didn't get to seize that $900,000? Yeah, I suppose. I don't recall the exact stuff, but that was a big deal, that amount. Did you want to make a distinction between your client and Mr. Hansberry as to the culpability for that loss? Absolutely, and the best news for me is it wasn't just me who made the distinction because what happens at our hearing, when we get up there, I start making my arguments and Judge Murphy starts agreeing with me, and he agrees with me as to pretty much three things, right? He agrees with me that, you know, and I don't remember the exact words, but I put them in the brief for you just in case. He says something like, you know, you're right, I don't recall that there was any direct evidence that said that Officer Watson was part of this whole thing. And he says, in fact, he used the phrase hard evidence. That was the phrase that he used. And he also agreed with me that the acquittal on the drug counts logically made sense, that it doesn't make him responsible for participating in this other stuff, okay? And the most important thing is the government said in its brief that Judge Murphy made a finding at sentencing that Gary Jackson was credible. If he did, it wasn't in my sentencing. It was not in my sentencing. He never said anything like that, and quite frankly, there's nothing in the evidence, including the fact that Judge Murphy had to castigate the guy twice to answer questions and quit trying to cause mistrials, that would cause him to reach that conclusion. So factually, is it the case with regard to this, the actual theft of the $900,000 from the semi-truck, is it the case that Mr. Hansberry was present but Mr. Watson was not present at that bus stop? No, no, there were any number of police officers present. I mean, just remind me, why factually is your client, in your view, less responsible or, you know, why was Judge Murphy saying no hard evidence against Watson? What's different about Watson with regard to the $900,000? Two things. First thing, I can't tell you why Judge Murphy said what he said. If I could, I'd be doing something else for a living. We don't concede, and there's no reason to concede, that the theft never took place. And my guess is, and my guess is, to answer your question, that the reason he made the distinction was probably because of the status of Hansberry being sergeant slash lieutenant and Watson being a P.N., along with any number of other police officers, including the informing police officer, whose name escapes me. But the one count that they were convicted of was conspiracy, right? Yes. So when you're a conspirator, you're tagged with everything that the conspiracy does, right? No. Well, if the $900,000 is part of the loss caused by the conspiracy and you're a conspirator, why are you not responsible for the theft? Because our circuit has said so, and it was nice of the government to cite the case, because, frankly, I was stuck with Corsi from the Second Circuit. I shouldn't say stuck with it. It sticks up for me. It says that you're entitled to separate consideration at sentencing, if I can just digress just for a second. But more importantly, Campbell, the case they cite, and you read my reply brief, I was overjoyed that they cited it, because I'm a trial lawyer. Like I listened to the last two ladies, they were fantastic. I couldn't know that kind of stuff. But what happens in the Sixth Circuit? What happens in the district court in Campbell? It's exactly the situation, Judge, you're talking about. You've got three defendants, all convicted of conspiracy involving drugs. But what happens? The district court judge correctly makes different determinations as to each person, as to what they're stuck with. I think it was a 15-kilo toll. I don't trust my memory on it as I'm getting older. I think he said three kilos. What's the legal reason for distinguishing between conspirators as to things like loss amount or drug possession? I mean, Judge DelVandian points out, you're sort of all in cahoots together. Usually you sort of own the enterprise. What's the legal reason? The legal reason, I think, is that everybody's entitled to separate consideration. Well, we get that. But if you're a conspirator, Norm, I mean, why aren't you treated the same for this purpose? Because you are treated the same for other purposes, I mean, some purposes. I don't know the answer to that, and I don't remember who's on the panel of Campbell. But it was three to nothing, so they had a rationale for it. And it's kind of a simple rationale to me because I've had plenty of conspiracy cases. And I've had plenty of them, by the way, again, in answer to your question, where different defendants are treated differently by the sentencing judge. Why? Because the evidence, the testimony, whatever it is that's presented to the judge, convinces him or her that, hey, this person was part of the conspiracy, but they're not stuck with all of it for purposes of sentencing. Remember, there's a distinction between being part of the conspiracy and get convicted. Then it's kind of difficult for me to say, yeah, I conspired on Tuesday, but I didn't conspire next Tuesday, so therefore you should acquit me because I'm guilty. I'm part of it at some point in time. But we're talking sentencing now. We're not talking— Is your objection as to this $900,000 business, is it more procedural that the district court, in your view, made a determination for both defendants during the Hansberry sentencing and you didn't get to participate? Is that the problem? Or I'm still waiting to hear, other than their rank, is there a meaningful factual difference, in your view, between the two of them as to the $900,000? I mean, which one is, or both, what is exactly your argument on this? To make it as precise as I can, there was no testimony whatsoever, none, that Brian Watson participated in any of this alleged theft. There was no testimony about it. In fact— He was at the bus scene, I mean, where they— At the stop. Okay. Yeah, along with any other number of people from his crew, there were any number of officers. There were federal agents there. There were different people there. Did Jackson only mention Hansberry as to the $900,000? Or what was it? Well, I don't know. I can tell you this, that, asking me to recall exactly what Gary Jackson said, he— I mean, the government says that Watson negotiated the payment with Jackson. That is complete and total nonsense. The payment to Jackson, you have to— None, but, Judge, you have to understand. It's hard to believe. You should have seen the look on the jurors' faces when I said it. It's hard to believe. The negotiation was between the city of Detroit through whoever, and Chief Godby testified to it. That was the $250,000 that he got. Jackson was saying today, when he testified, not today, he was saying they stole the money. But there's nothing to support that other than Gary Jackson saying so. Judge Murphy kind of thought, well, maybe the tape said so. But the tape didn't say so. There's nothing in the tape that Jackson made. Did Jackson testify at trial that they stole the money? He testified at trial. I mean, the jury can believe that, right? Except if they— But what Judge Murphy said is true. If they believed Gary Jackson, it's just like Lamont Calhoun and all the rest of these people they brought off the streets. If they believed any of them, they'd have been convicted of everything. Jackson accused them of dope dealing. Jackson accused— You're right, but we're talking sentencing. Remember, we're back to talking sentencing. We're not talking about what the conviction was for the conspiracy for the Hobbs Act. But for the sentencing purposes, I just think the case should go back. What do you want on the $900,000? What are you asking? Zero. And I think that Judge Murphy would agree. You read the transcript. He agreed with me sitting there. I want zero. There's insufficient evidence that should apply to Hansberry too, but I'm not speaking for him. Don't ask for more than you can get. It should be zero. It really should. And I think if the judge got it back, based on what you have in front of you in the transcript, if he got it back, I think he'd come to the conclusion, with respect to Watson— Well, then why do you think he didn't? You're sort of making the case, he's with me, he's with me, he's with me, and then he hammers you at the end. Because, Judge, because that's when he violated the holding in Corsi and also what Campbell said. What he did was he said, well, but I ruled that way in the other hearing, and that's what you can't do. That's exactly my point. If we tell him he's wrong about that, then you think he's going to give you zero on the— I don't know what he's going to do, but I think it's going to be—I think he's going to just be me and him and Watson, and I think he's going to think and he's going to see what he said in the past, and I think, yeah, I think we have a decent chance of getting to zero in 46 to 57 months' guidelines, and I see I'm at zero-zero. So thank you very much. Thank you, sir. We didn't have time to discuss Michigan basketball. That's okay. You're from the government. Good morning, and may it please the Court. Shane Crawley for the United States. I would like to start first. I'll leave the sentencing until the end. I think one of the things that might help clarify this, the discussion by Mr. Hansberry, this was not a case in which the defendants were charged with purely extortion under color official right, and to answer Judge Navanian's question, they were instructed on the quid pro quo when they were instructed on the substantive counts. And so I'll actually point you to that for purposes of the color official right. That would be on page ID 6635 to 36. They were instructed essentially that if a public official were to accept or demand property in return for a promised performance or nonperformance of an official act, and that's, in other words, a quid pro quo. So that goes to the color official right. So that helps his argument, right? He says they were instructed on quid pro quo. The only mistake was the robbery was thrown into count one. The jury says, hey, do we have to convict them of one of the substantive counts in order to convict of the conspiracy? The judge says no. They could say, well, we don't find any quid pro quo, so you're acquitted on all the substantive counts. But, hey, there's that robbery language in count one, so I guess you're guilty of the conspiracy because we think maybe there was a robbery, there were robberies. So I'd like to take a step back first. No, they weren't instructed on robbery. They were never actually instructed on what a robbery means. So the difference between an instruction on extortion is the judge said, you need to find a conspiracy, an agreement to commit extortion, and I'm going to define what that means in a moment. That was what he instructed on page 6629, specifically with respect to the conspiracy, that two or more people conspired or agreed to commit extortion, as I will describe that crime shortly. There was never a definition as far as robbery that it needs a taking by force. The stray remark by the judge. It was a stray inclusion. When did that happen? Exactly, the stray remark. I'm sorry, Judge. When did the stray remark about robbery, count one, happen? Can you remind me of that? Yes, Your Honor. It's an humongous record. It is enormous. So typically when there's an instruction on conspiracy, you go through the elements. I got that. When did Judge Berkman talk about robbery? So it's after the instruction on the agreement and joining the conspiracy. There's a reference to the fact that you don't have to find that they engaged. So it says specifically, one more point about the agreements. This is kind of like at the very end of the conspiracy instruction. One more point about the agreement. The indictment accuses the defendants of conspiring to commit several acts of robbery and extortion, but the government must prove an agreement to commit at least one of them for you to return a guilty verdict on that conspiracy charge. That's when he's instructing the jury? That is when he was instructing the jury. So after he had instructed on what the elements of the offense were, there was that stray remark about robbery. And so that was the only time the term robbery was included in the entire jury instructions. And there wasn't anything in writing that said robbery that they took into the? That's correct, that's correct. This was an instruction that was submitted jointly by the parties. This was an instruction that no one objected to. That language was jointly submitted, what you just read? Yes, Your Honor. It was submitted, and this is in my brief. There was a preliminary instruction submitted by the parties, and there was case law in the early 90s that suggests that's a waiver. I'm not asking if you do that. I think that's plain error based on subsequent case law. But the parties jointly submitted this in a preliminary jury instruction. They then submitted it again to the law clerk via e-mail for the final jury instructions. There was a charge conference on day 17, I think, of the trial in which they went through everything, and the only objection was, I think, to whether or not a prior inconsistent statement. There was no instruction as to the substantive offenses. And so it's? But why isn't there some appeal to his story? I'm still like, okay, fine, maybe it wasn't, they weren't instructed on robbery. But they clearly thought there was a difference between count one and the substantive counts. Not necessarily, Your Honor. And I think that's the problem with inconsistencies. They disbelieved every single witness on the substantive counts, but thought that there was a conspiracy because of the other testimony about what the scheme was? It requires speculation on my part as to determine what the jury was thinking. I mean, this is why we don't go into inconsistent verdicts unless they're mutually exclusive. Was it compromise? Was it a mistake? From my perspective, looking at the evidence, I think it was a mistake. They didn't understand the substantive counts, perhaps. But the evidence was quite clear that there was an agreement. And if you exclude all of them. Between the two defendants? Not just between the two defendants. Certainly including David Hansberry and Brian Watson, but also including Gary Jackson, also including Lamont Calhoun, also including co-defendant and cooperating witness, Arthur Rebels. Correct me if I'm wrong. Yes. The people you just mentioned are not the people from whom they're, in your view, extorting money, correct? That's correct. This kind of dovetails with Judge Nalbandian's point about the weirdness of this case. Yes. I mean, set aside the agreement between the conspirators. Extortion, the quid pro quo, this for that, implies an agreement between the people who are exchanging the this for that. Granted, it's under duress, but it's an exchange between them. As opposed to robbery, where you come in and just by force take it. That's not a conspiratorial agreement that would be alleged or charged. Let's forget about conspiracy altogether. Just on the substantive offenses. There is an exchange, very tainted, albeit. But there's an exchange in extortion. Robbery, you just take it by force. There really isn't a quid pro quo when officers just show up, bus some dealer who they know has money, take his money, and then say, get out of here. That's more like taking it by the force of his office, so to speak. Well, Your Honor, I would remind you, and this was the point I was starting with, they were not charged and instructed purely on undercolor official right. In my view, this is a spectrum. So they were charged as extortion, undercolor official right, and under actual or threatened force, violence, or fear. And in my view, this is a spectrum. Isn't that robbery, the second part of that? No, that's actually the text from the Hobbs Act extortion. 1951b-2. That's correct. That literally comes from the statute. Force, violence, or fear, or undercolor official right. That's correct. And that's extortion. That is the definition of extortion. And I will agree with you that where robbery ends and extortion begins is very blurry. I think LaFave even says it's to the point of being academic, and I'm not going to pretend to be able to limit the two. But they were charged under both, instructed under both, and Hansberry has focused exclusively on undercolor official right, I think by looking to the caption. The caption on the charge count says undercolor official right, but as we know, the caption is not controlling. A bullman from the 90s, this court has said, we look at the text of the count itself. And that charged both. And so the jury was charged, they were charged on both, instructed on both. And so really this is an agreement by the defendants to wrongfully use their position as police officers to extort, in other words, to obtain property from drug dealers. Sometimes it's undercolor. By which means, do you think? Well, sometimes it's undercolor official right. And I think the best example of the prit-quo-quo is Nicholas Simmons. And that was an individual who they did search his house. That was, again, more of the fear angle. They searched his house and he said, are you going to charge me? And they said, well, we can sign you up as a source. And he said, no, I don't want to do that. And they said, well, then you need to give me doping money. And so we gave him five kilograms of cocaine and $100,000 and they let him go. That's a quid pro quo. And that, frankly, is the only evidence I need in order for you to find it sufficient. I'm sorry I wasn't trying to cut you off. I'm sorry to interrupt. Didn't Evans, did the Supreme Court in Evans imply, though, at least, that when public officials are involved, that extortion was going to be essentially taking a bribe, quid pro quo? Yes, Your Honor. But that was only under the color of official right context. So as long as you charge both under color of official right and the other part of the Hobbs Act extortion, it doesn't matter that it's a public official. You can still prove, like, regular strongman extortion kind of thing. In my view, yes. I'm not aware of any case law that says just because I'm a public official I can't also extort you by fear, violence, or force. And, frankly, this is a scheme that only works because they're law enforcement. Now, there's this argument that they're lawfully doing these things, but that's not the case. Each one of these seizures was a setup from the get-go. But you just said the scheme only works because they're law enforcement. So doesn't that mean they have to be their public officials? Correct. So why are we not then in that box where we need a bribe scandal and not just the force? Because their conduct didn't always fit a – well, first of all, they were only convicted on the conspiracy, so I will fall back on that agreement. But they weren't only using a quid pro quo scenario. Sometimes it was simply to instill fear in the drug dealers that I'm going to arrest you, and therefore you will relinquish your property in order to avoid getting arrested. You are saying the fear of some official action. Correct. I mean, it's not the fear of I'm going to shoot you. Correct. It's the fear of I'm going to arrest you. Arrest, prosecute, convict. And none of these people were charged, at least by the state. They get a pass. This is not a scenario like in Dean. That's the D.C. Circuit case that Mr. Hansberry relies on. This is not a situation where they were lawfully engaging in their conduct and then after the fact skimming off the top. This was not a situation where it goes back in evidence and then they take a kilo for themselves. From the outset, it was a setup. It was a setup because they had Gary Jackson, they had Lamont Calhoun, they had Louis Mars and other people identifying drug dealers in order to set up, and then they were wrongfully using their lawful position in order to fake a search warrant, fake a traffic stop, and take these drugs. How do you fake a traffic stop? I mean, couldn't you think of it as it's a legitimate traffic stop because these guys have drugs, but then they do bad stuff at the back end of the truck? Well, how do you fake it? Well, for one example, and that would be the example of Chester Browning. He was an individual that drove up from Kentucky. You have someone who's not a police officer dress up as a cop and participate in the traffic stop. That would be one way. But there were ones where the officers themselves pulled the drug dealer over and they're allowed to do that, right? Well, not if there's not probable cause. It depends on the reason. I thought you were calling it a fake traffic stop because they weren't doing anything. This was purely to obtain property. It's true. They had information that these folks had drugs, so I don't know if the point is that it was a legitimate traffic stop, not because they were speeding, but because they had actual information that they had drugs. That's correct. This was never a lawful traffic stop or search warrant from the get-go. And frankly, the search warrants, they forged search warrants. One judge in Wayne County testified, I never signed the search warrant. So this was a circumstance where the agreement was we are going to wrongfully use our position to obtain property by under a color of official right as well as by fear, the fear of being arrested, the fear of prosecution, and it was never lawful from the get-go. Just to be clear about the difference between the under color of right and whether quid pro quo was required. As I understand it, you would say there was a quid pro quo. You give us the drugs, we won't arrest you. Yes, and I would say that in some situations, and Nicholas Simmons would be the best example, sometimes it was quite explicit what that quid pro quo was. I think it's much harder for me, and I will concede that if I jump out of a car and abandon my drugs, that's harder for me to argue there's a quid pro quo. And that's where I'm arguing the extortion under fear. Because if I abandon that drug, that's hard. So I can say, no, I'm not giving you the drugs, arrest me. Yeah. But they have the drugs. I mean, how are they not taking drugs? What are you willingly doing in that situation? So there's a distinction. So if I'm in the scenario of the search warrant or the traffic stop and they've seized the drugs, that's different. What I'm talking about with Nicholas Simmons is they'd already taken drugs and an AK-47 and money from his house. And then he said, are you going to charge me? And they said, no, we want to make you – no, we're not going to. He's kind of the exception in all this. He is the most explicit example I have of the quid pro quo. Take one that's less explicit. Explain that. Well, I'd rely on the extortion under fear in those scenarios. Okay. Because that's why I say it's a spectrum. Because I don't think – I mean, to your point, this is not a clear-cut example. And I think this is why Justice Thomas in the Ocasio case said, I'm not really sure that under color official right is the equivalent of taking a bribe. And the Supreme Court may have gone astray there. Obviously, we can't overturn that, and I'm not suggesting you do. But if you look at that Ocasio case from 2016, it is odd to say extortion under color official right is always a bribe scenario. That's not where we need to go here. But you're saying it doesn't matter because fear – They were charged under fear, proved under fear. You would still be guilty as a public official of – Ocasio doesn't say this is the exclusive way to get a public official, right? Correct. No, I mean, and I'm referring to Evans there as the case that kind of said the quid pro quo, yes. But Ocasio essentially said, and I think the issue going back to the very beginning, the victim doesn't always agree. The victim doesn't always have to agree in the conspiratorial context. And there's a lot of discussion in Mr. Hansberry's brief that the victims, the drug dealers, didn't agree. And Ocasio, Justice Alito, said that's true. They don't have the same criminal objective. If I pay you a – if I'm being – if there might be a shakedown scenario, if you're saying I'm going to trash your store if you don't pay me money, that's not a conspiratorial agreement. Now, I might agree that I'm giving you in a non-legal context, but this is where we get into legal agreement versus I'm giving you money so you don't trash my store. And here, everything was alleged properly, albeit – I mean, this is not the clearest example. Is it robbery? Is it extortion? I think it's right on that line in many instances. But the jury was instructed only on extortion, other than stray remark. The fact that it also proves robbery is beside the point. The government's allowed to pick one theory and go with that. And for the most part, the government relied on the term RIP, which was short for rip-off. The fact that a witness describes it as one thing is not controlling. And so I would submit that this was fine. And even if we exclude all the acquitted conduct, we can look at Gary Jackson and the recording that was made where, in August of 2010, he enters into that agreement. And David Hansberry and Brian Watson said, now that we know that you're not the feds, now that we know you're not ATF and FBI setting us up, you identify people for us to obtain drugs and money, then you're good. You can be a millionaire doing this, and we're your get-out-of-jail-free card. That's a good example. Another example. Arthur Lovells, co-defendant, co-conspirator, testifies. And he said, after I got flipped, the FBI arrests him, he starts making recordings of both Hansberry and Watson. And there were recordings in September of 2014 where they were trying to set up another staged traffic stop, again, showing an agreement. They were convicted on agreement. There was ample evidence to convict them of that. And I would submit that that was also required. The sentencing issue that Mr. Fishman was talking about. The sentencing issue is. . . What evidence is there that the .900 was stolen? Yes, Your Honor. How do we know that Watson was responsible? So let's take a step back just for a moment. The defendants essentially objected to the loss amount, and the probation initially included the loss for all of the seizures. And Judge Murphy decided he was not going to count the acquitted conduct and rely only on. . . What was that all the seizures number? It was like $2 or $3 million. It was a substantial amount. All right, go ahead. I don't know offhand, but he decided he's not going to find that. I think legally he could have. He decided he wasn't going to. Okay. So they're relying primarily on the difference in the $3 million that was supposed to go to the cartel and the $2.1 million that was actually obtained by DPD. And there was a hearing. Neither Hansberry nor Watson offered an alternative view. They simply said, Jackson's not credible. There was a hearing where it was basically both sentencing back-to-back. As Mr. Fishman described, he was present with Hansberry's proceeding, which started. And they argued credibility. And Judge Murphy says, I found Jackson credible. I remember that tape after the fact, and I recall it vividly, and I find him credible. And as a result, I'm going to hold Hansberry responsible for this. And Mr. Fishman's correct. He did ask to be heard on that. And Judge Murphy said, I'll let you do that in a moment. And so he gets right up. They have the sentencing right after Hansberry's. And they talk about credibility. And they talk about also whether or not Watson was involved. And Judge Murphy says, look, having gone through all of this, and this is on page 2059 and 2060 of the record, having gone through all of this, having gone through this whole thing, I say to all of you, number one, that tape that Jackson made established to my satisfaction a number of things. And he essentially says, look, I would need some sort of facts. If you look at 2059 to 2060, I would need some other facts other than what you're arguing to find him not credible, since I just found him credible in the prior proceeding. So the only thing that Judge Murphy is – Is he speaking to Watson? He's speaking to Mr. Fishman and Watson at that time. So the finding that went from one hearing to the next was, I found this witness credible. I need something new to not find him credible. And you're basically saying the same thing. Now, that's different from whether or not he's responsible and accountable for that. But I think that that's completely appropriate for a judge to rely on a prior credibility finding from another proceeding unless there's some sort of new facts to challenge that credibility finding. And there really wasn't from one sentencing to the next. But was the $900,000 – A, did it need to be specifically linked to Watson? It did not, but it was. And B, was it linked to Watson? Yes, it was, Your Honor. So legally, no, it did not need to be. Once you're part of the conspiracy, you are responsible for anything that's reasonably foreseeable in the scope of that conspiracy. And here, that clearly was within the scope of the conspiracy. So the reason there might be a distinction would be if Mr. Watson had joined the conspiracy after this. But, of course, he hadn't. The evidence was that Mr. Watson helped negotiate this very seizure. Arthur Lovells and Brian Watson negotiated this takedown of this semi-truck going back to the Mexican cartel. If you look in my portion of the sentencing brief, I lay out all the page IDs, of course. But essentially, he was involved from the beginning. Now, he is at the seizure, and he has Arthur Lovells, who was communicating with Gary Jackson, relay information. So Brian Watson is there, and he said, first, tell Gary Jackson that we sweet. That was a quote. And then also said, hey, can you ask him if these were stored sequentially? In other words, if you see the photos that I attached in the district court record, these were all bound, saran-wrapped pools of money, and they were labeled like 1 out of 30, 2 out of 30, 3 out of 30. That was after the fact. Brian Watson was actually asking Arthur Lovells to have Gary Jackson say, is that the way it is? Because obviously that makes it harder to seize, right? The cartel does this, make it sure that someone's not picking it off on the way, and obviously makes it hard for the cops to do it. I don't know how they did it, but clearly they did, because only $2.1 million ends up in the Detroit police bank account. And Arthur Lovells says, hey, after this, all these guys start rolling up in nice cars. David Hansberry has an Aston Martin. Another guy buys a boat. Clearly money was seized. And so to answer your question, legally it was reasonably foreseeable, because he was part of the conspiracy. It's within the scope of the conspiracy. And there's direct evidence that he was involved. And the fact that Judge Murphy said what he said does not change the fact that there was sufficient evidence to find that, and he did not submit that. You seem to have these misgivings in your view. I know this is just speculating, but I'm just trying to get a – well, anyway. May I answer the question, Your Honor? Yeah, please. Just because my time expired. I'm not sure, and it could be because the record was so large that he was struggling to recall the exact connection between Watson and Hansberry as far as how Watson was directly there. Certainly it took – to read this transcript took a substantial amount of time for me. I'm sure it took you and your law clerks a substantial amount of time as well. I'm sure that he can remember what happened with respect to the actual seizure and with the recording that happened after the fact, but whether or not Watson was involved before and how, that probably wasn't at the top of his – at the tip of his mind during this proceeding. Okay. Thank you, Judge. Thank you. Appreciate your argument. We'll hear a rebuttal. Thanks. I'm sorry, Your Honor. Is it possible to give Mr. Fishman 30 seconds of my two minutes? Sure. If our work is functioning. Okay. I'll take more than this. No, no, no. Don't go there. You guys are cutting it pretty fine. Take what you can get. I'm sure there's a strategy behind that. Anyway, go ahead. Okay. Good morning again, Your Honors. Nicholas Simmons. Nicholas Simmons was an individual that the government says Mr. Hansberry extorted. Nicholas Simmons had illegal drugs, had money. Mr. Hansberry talked to Mr. Simmons, said, hey, I got this. This is what I want you to do. Can you work for me? Will you work? Good police work. Excellent police work. Simmons said no, right? Well, you know, Simmons said initially no. But then Simmons decided he was going to do it. And I think that he said, well, I need to find more drugs. I need to find more, more, more money. I think this is good police work. I don't think this is extortion. I don't think that it's robbery. I think what the fine line is, and I think we talked about it earlier, is the fact that the judge, Judge Murphy, used the word robbery. And I know the government said it's a stray remark. It's a stray remark. But it was part of an instruction that both sides submitted to the judge. I know. I mean, that's almost like outright waiver. It is. Invited error. But for, but for, Your Honor, the fact that it was addressed. But for the fact that it was addressed at the motion for a new trial. And Judge Murphy addressed it. And he said it. That's why we're here. I don't think it's plain error. We're here now because he did address it. If he hadn't addressed it, then we wouldn't be here. Oh, it's after the jury, or after the trial. So you're definitely in plain error. It is. Well, it is, Judge. But it was addressed. It's a do-over. I know, Your Honor. And I'm just saying that I don't think that the jury found, in fact, Nicholas Simmons, they acquitted him on that count. They acquitted him on the substantive count with Nicholas Simmons. I don't think the jury believed it. I think they believed robbery. They heard robbery. Thank you very much. Thank you, sir. We'll hear from Mr. Fisher. Let me sprint up here so I don't waste any time. Page 2060. I went back and looked at my brief. In all fairness, I heard the government say that this had something to do with Mr. Watson. If you read what the judge said about his conclusions from the Hansberry sentence, what he said was, if I relied on those facts, blah, blah, blah. And I would say, in all honesty, that the tape that Jackson made established, to my satisfaction, a number of things, including Hansberry's guilt beyond a reasonable doubt and his leadership role. It doesn't say a word about Watson. The reason I wanted to have my 30 seconds is all of you asked me what exactly am I asking. What I'm asking is for the Court to find, if it gets to the sentencing issue, to find that Judge Murphy did not make the independent sentencing determination that he's supposed to do by Corsi, which is my second circuit case, and send it back for independent consideration, and we can hash all this out again. I noticed in the questioning, and I agree with the government lawyer, he wasn't there. I was there, and I can't tell you what exactly was in his mind. But I think there's sufficient things in what he said at our sentencing, including the part that's been cited by the government that I just read to you, that if it goes back again, he's going to have to focus only on Officer Watson, and I think it would be a different result. Is there a case that you can think of that's especially strong for you as to the procedural point in support of do it over? I think the Corsi case in the Second Circuit says that. I think they said that the sentencing – Campbell, was that the other one? Campbell was our Sixth Circuit case, but Campbell just was an answer to Judge Nalbandian's question about the different ways of treating people at sentencing, even though they've been convicted of a conspiracy to distribute something else. Okay. Thank you for your argument. Thank you all.